1

2

3

4

5

6

7

8

9            IN THE UNITED STATES DISTRICT COURT

10

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12   MEDTRONIC, INC.,

13            Plaintiff,                        No. C 04-2201 JSW

14        v.                                    **ORDER RE CROSS-MOTIONS
                                                FOR SUMMARY JUDGMENT;**
15   GEOFFREY WHITE,                            **ORDER DENYING DR. WHITE'S
                                                MOTION TO STRIKE; ORDER**
16            Defendant.                        **IMPOSING SANCTIONS FOR
     _____/         VIOLATING RULE 15**
17   LOS ANGELES BIOMEDICAL RESEARCH
     INSTITUTE AT HARBOR-UCLA MEDICAL
18   CENTER,

19            Third-Party Intervenor and
              Plaintiff,
20        v.

21   GEOFFREY WHITE,

22            Defendant.
     _____/
23

24        Presently before the Court are cross motions for summary judgment on the issue of ownership

25   of U.S. Patent Nos. 6,582,458 (the "'458 Patent") and 6,613,073 (the "'073 Patent") (collectively,

26   the "patents in suit") filed by Medtronic, Inc. ("Medtronic"), Los Angeles Biomedical Research

27   Institute ("LA Biomed"), formerly known as the Research and Education Institute at Harbor-UCLA

28   Medical Center, and Dr. Geoffrey White.  Having considered the parties' papers, relevant legal

1

1  authority, and having had the benefit of oral argument, the Court HEREBY DENIES Medtronic's

2  motion for partial summary judgment, DENIES LA Biomed's  motion for partial summary judgment,

3  and GRANTS IN PART and DENIES IN PART Dr. White's motion for partial summary judgment.

4  **I.      PROCEDURAL HISTORY**

5         On August 15, 2003, Edwards Lifesciences LLC Research initiated a patent infringement

6  lawsuit (the "*Edwards* patent litigation") against Medtronic, Inc. and Cook Incorporated ("Cook").  In

7  that case, Edwards alleges that defendants are infringing the patents in suit.  On March 17, 2004,

8  Medtronic moved to dismiss on the grounds that Edwards did not have standing to sue because one of

9  the two inventors of the patents in suit, Dr. White, was contractually obligated to assign his ownership

10  interest in the patents in suit to Medtronic and/or LA Biomed.[1]  On June 14, 2004, Medtronic initiated

11  the instant breach of contract action against Dr. White.  LA Biomed subsequently intervened in the

12  case by stipulation of the parties and asserted its own breach of contract claims against Dr. White.[2]

13  Following the hearing on Medtronic's motion to dismiss, the Court stayed the *Edwards* patent

14  litigation pending resolution of the ownership issue of the patents in suit.  (*See* Order dated November

15  1, 2004.)  The Court ordered limited discovery and scheduled a hearing on cross-motions for

16  summary judgment related solely to resolution of the ownership issue.[3]

17  **II.     FACTUAL BACKGROUND**

18         The following facts are undisputed except where otherwise indicated.  Dr. White is an

19  experienced vascular surgeon that began his training in the 1980s.  (Declaration of Dr. White dated

20  July 20, 2004 ("White 2004 Decl.") at ¶¶ 3, 4.)  Between 1985 and 1989, Dr. White was Chief of

21  Vascular Surgery at the Veteran's Administration Medical Center and was on staff at Harbor/UCLA

22  Medical Center.  (*Id.*, ¶ 4.)  As part of his employment with LA Biomed, Dr. White signed a "Patent

---

23    [1]        Throughout this order the Court refers to REI by is current name, LA Biomed.

24

25    [2]        By order dated June 9, 2004, the Court related the *Edwards* patent litigation to *Medtronic, Inc., et al. v. White*.

26    [3]        The parties dispute whether ownership of U.S. Patent No. 5,782,904 (the "'904 patent') is
   properly part of the motions for summary judgment.  While Medtronic's breach of contract case against Dr.
27  White involves the '458, the '073, and the '904 patent, the *Edwards* patent litigation only involves the patents in
   suit.  The Court's order specifically limited these summary judgment motions to ownership of the patents in suit,
28  and the Court did not state or intend to state that these motions for partial summary judgment would include the
   '904 patent.

1   and Copyright Agreement" with LA Biomed (the "LA Biomed Agreement") in 1985, which obligated

2   him to assign to LA Biomed any patentable device that is "conceive[d], and/or reduce[d] to practice

3   while employed by LA Biomed or using its research facilities."  (*Id.*, Ex. 7, ¶ 4.)

4          On or about July 21, 1989, Dr. White entered into a consulting agreement with Medtronic (the

5   "Medtronic Agreement").  (Declaration of Bijal V. Vakil in support of Medtronic's Motion for

6   Summary Judgment ("Vikal Decl."), Ex. 3.)  By this agreement, Dr. White agreed to "serve as an

7   advisor to Medtronic regarding Medtronic's vascular graft product performance in Australia."  (*Id.*)

8   As part of this work, the parties agree that Dr. White was asked to contact a surgeon in Australia, Dr.

9   Grosser, to discuss his use of the Medtronic vascular graft.

10         Under Section IV entitled "Inventions/Assignment," the Medtronic Agreement states that:

11         During the term of this Agreement it is contemplated that you will generate ideas, inventions,
           improvements, suggestions or copyrightable materials.  These will fall into one of two
12         categories: (A) Ideas, inventions, improvements, suggestions or copyrightable material *derived
           directly* from your consultation under this Agreement; (B)  Ideas, inventions, improvements,
13         suggestions or copyrightable material *not derived directly* from your consultation under this
           Agreement.

14

15   (*Id.* (emphasis added).)  Under this agreement, Dr. White agreed "to disclose and assign to Medtronic

16   in a form satisfactory to its Chief Patent Counsel any idea, invention, improvement, suggestion or

17   copyrightable material" that was derived directly from his consultation under the Medtronic

18   Agreement.  (*Id.*)  The assignment provision does not, however, apply to ideas, etc. not derived

19   directly under the Medtronic Agreement.  For ideas not derived directly, the Medtronic Agreement

20   states that "[f]or your protection, you agree that you will not disclose ideas, inventions, improvements,

21   suggestions or copyrightable material as defined in IV.B. unless you have determined that you wish to

22   assert no proprietary interest or you have established a separate written agreement with Medtronic."

23   (*Id.*)

24         Under a section entitled "Confidentiality," the Medtronic Agreement states that "[a]ny

25   information, data, devices, and results of study developed in the course of providing your consulting

26   services are or shall be the property of Medtronic and shall be maintained in confidence and not used

27   by you for profit without written consent of Medtronic or until the expiration of two (2) years from the

28   date of expiration or cancellation of this Agreement."  (Vikal Decl., Ex. 3.)

1    The term of the Medtronic Agreement was for one year beginning on August 1, 1989 and is

2    governed by the laws of Minnesota.[4] (*Id.*) Dr. White returned to conduct research in Australia in

3    August 1989 and came back to the United States in December 1992 and January 1993 to conduct

4    research at LA Biomed's facilities. The parties dispute what work Dr. White actually performed and

5    what information he actually reviewed under the Medtronic Agreement.

6    On September 30, 1993, Dr. White and the co-inventor of the patents in suit, Dr. Yu, filed a

7    patent application in Australia for "intraluminal grafts." This graft, which the Court refers to as the

8    GAD-graft device, is a vascular graft that is designed to treat aneurysms or occlusive diseases. (Mace

9    Decl., Exs. 1, 2.) Unlike other grafts, the GAD-graft device is not sewn directly into the vessel during

10   an open procedure, but is rather delivered to a damaged vessel "intraluminally," via catheter. (*Id.*)

11   Instead of having a separate stent sewn to the top of the graft material, the GAD-graft device uses

12   wireforms interwoven into the graft material along its length in order to circumferentially support the

13   graft material. (*Id.*) In 2000, Dr. White filed a patent application for the GAD-graft devices under the

14   Patent Cooperation Treaty ("PCT") for what would later become the '458 and '073 Patents. Both

15   Medtronic and LA Biomed now claim an ownership right in the patents in suit by virtue of Dr. White's

16   previous work in 1989 and 1992-93, respectively.

17   Resolution of Medtronic and LA Biomed's claims against Dr. White turns on determining

18   when and where Dr. White developed and eventually reduced to practice the inventions that later

19   became the patents in suit. Medtronic asserts that Dr. White generated his ideas for the patents in suit

20   while he was working as a consultant for Medtronic in 1989. Dr. White argues that he developed and

21   reduced to practice his inventions in Australia between 1991 and 1993. LA Biomed contends that Dr.

22   White actually reduced to practice the patents in suit in December 1992 and January 1993 when he

23   and Dr. Yu, conducted a series of tests at LA Biomed's research facilities.[5]

24

25   [4]    Dr. White argued in his summary judgment motion that Medtronic terminated the Medtronic
26   Agreement shortly after it commenced. (White Mot., p. 18.) At the hearing, however, counsel for Dr. White
     conceded that termination of the Medtronic Agreement required sixty days' written notice, and that there was
27   no evidence in the record that either Medtronic or Dr. White provided such notice.

28   [5]    Medtronic and LA Biomed have entered into an agreement, the terms of which are
     confidential, whereby LA Biomed has agreed to transfer any rights it obtains in the patents in suit to Medtronic
     in return for Medtronic's agreement to reimburse LA Biomed for its attorneys's fees incurred in connection with

1    **III.    ANALYSIS**

2         **A.    Legal Standard.**

3         A principal purpose of the summary judgment procedure is to identify and dispose of factually

4    unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment

5    is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together

6    with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

7    party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if

8    there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v.*

9    *Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the

10   outcome of the case.  *Id.* at 248.  "In considering a motion for summary judgment, the court may not

11   weigh the evidence or make credibility determinations, and is required to draw all inferences in a light

12   most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F. 3d 732, 735 (9th Cir. 1997).

13        A party moving for summary judgment who does not have the ultimate burden of persuasion at

14   trial, must produce evidence which either negates an essential element of the non-moving party's

15   claims or show that the non-moving party does not have enough evidence of an essential element to

16   carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210

17   F.3d 1099, 1102 (9th Cir. 2000).

18        Once the moving party meets this initial burden, the non-moving party must go beyond the

19   pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for

20   trial."  Fed. R. Civ. P. 56(e).  The non-moving party must "identify with reasonable particularity the

21   evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

22   (*quoting Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a

23   district court's task to "scour the record in search of a genuine issue of triable fact").  If the non-

24   moving party fails to make this showing, the moving party is entitled to judgment as a matter of law.

25   *Celotex*, 477 U.S. at 323.

26        **B.    The Medtronic Agreement**

27   _____

28   this lawsuit.  Pursuant to this Agreement, Medtronic also has the right to approve of the language included in
     any filings in this case by LA Biomed.

1    Medtronic's ownership interest, if any, in the patents in suit depends upon a showing that Dr.

2    White derived his "[i]deas, inventions, improvements, suggestions or copyrightable material" *directly*

3    from his consultation.[6]   (Vikal Decl., Ex. 3 (Medtronic Agreement, Section IV).)  Prior to evaluating

4    the evidence, it is necessary to define the scope of Dr. White's duties under the Medtronic Agreement.

5    Section I of the Medtronic Agreement states that "[y]ou will serve as an advisor to Medtronic

6    regarding Medtronic's vascular graft product performance in Australia."  (*Id.*)  The contract contains

7    an integration clause that states that "[t]his Agreement represents the only Agreement relating to this

8    subject matter between you and Medtronic."  (*Id.*)

9    Medtronic argues that Dr. White's duties under the Medtronic Agreement should be

10   interpreted broadly to obligate Dr. White to act generally as a "vascular graft consultant," a "graft

11   advisor," or as a "consultant for 'Medtronic's vascular graft product' in Australia."  (Medtronic's

12   Mot., pp. 1, 4, 18, 21.).  This interpretation is based, in part, on a July 17, 1989 letter sent to Dr.

13   White that purports to describe in greater detail the work Medtronic contemplated Dr. White would

14   perform under the Medtronic Agreement.  (Vikal Decl., Ex. 4.)

15   Consideration of extrinsic evidence such as the July 17, 1989 letter is inappropriate when the

16   contract is integrated and the terms are not ambiguous.  Here, neither party argues that the contract is

17   ambiguous, and therefore, the Court declines to consider the July 17, 1989 letter or any other parol

18   evidence to interpret the terms of the Medtronic Agreement.  *Alpha Real Estate Co. of Rochester v.*

19   *Delta Dental Plan of Minn.,* 664 N.W. 2d 303, 312 (Minn. 2003) (stating that parol evidence is

20   inadmissible to vary, contradict, or alter the written agreement).  Based on the foregoing, the Court

21   interprets the contract to obligate Dr. White to evaluate Medtronic's vascular graft product

22

23

24

25

---

26   [6]    It is immaterial for purposes of these motions, which are limited to resolving the issue of
ownership of the patents in suit, whether Dr. White breached Section IV.B of the Medtronic Agreement.  That

27   section relates to Dr. White's obligation not to disclose ideas, etc. that are not derived directly from his work
under the Medtronic Agreement, unless Dr. White has determined that he wishes to assert "no proprietary

28   interest or [he has] established a separate written agreement with Medtronic."  (Vikal Decl., Ex. 3.)  A breach of
this section would not result in assignment of the ownership of the patents in suit, but would more likely result
in contract damages.

1    performance in Australia only.[7]

2          **1.      Term of Assignment Provision in Medtronic Agreement**

3          The Medtronic Agreement's Assignment provision states that "[d]uring the term of this

4    Agreement..." Dr. White agreed to assign ideas, etc. that he derived directly from his consulting work.

5    (Vikal Decl., Ex. 3 (Section IV).)  The term of the Medtronic Agreement was for a period of one year

6    beginning on August 1, 1989.  (*Id.* (Section V).)  Under a separate section entitled Confidentiality, Dr.

7    White agreed to "keep confidential and not use for profit without written consent from Medtronic or

8    until the expiration of two (2) years from the date of expiration or cancellation of this Agreement, any

9    information, data , devices and results of study developed in the course of providing your consulting

10   services."  (*Id.* (Section III).)  Contrary to arguments made by Medtronic's counsel at the hearing, the

11   two year "tail" specifically refers to disclosure or use of Medtronic's confidential information, but not

12   to the assignment provision.  Based on the foregoing, the Court interprets the assignment period to

13   cover only the time period between August 1, 1989 and July 31, 1990.

14         **2.      Problems Identified in the Dilley Report and Jackie Eastwood's Reports With
                   Medtronic's Vascular Graft.**

15

16         The Court now turns to evaluating Medtronic's argument that Dr. White derived the patents in

17   suit directly from his consulting agreement.  First, Medtronic contends that Dr. White was able to

18   derive directly the ideas, etc. for the patents in suit directly from two documents that were sent to him

19   that purportedly contained information relating to Medtronic's vascular graft product performance in

---

21         [7]      Grafts like the GAD-graft device are deployed to the damaged vessel via catheter, whereas
22   vascular grafts are directly sewn into the vessel during an open procedure.  Medtronic argues that the term
     "vascular graft" used in the Medtronic Agreement included both vascular and endovascular grafts.  (Medtronic
23   Mot., p. 9.)  Under Medtronic's theory, Dr. White derived the ideas, etc. for the patents in suit while he was
     working for Medtronic because Dr. White's consultation under the Medtronic Agreement encompassed
     endovascular grafts, and the patents in suit relate to endovascular grafts.
24         Resolution of whether the use of the term "vascular grafts" in the Medtronic Agreement included
     endovascular grafts is not a material issue here.  It is undisputed that the vascular graft that was the subject of
25   the materials purportedly reviewed by Dr. White related to a vascular graft sewn directly into a blood vessel.  It
     is also undisputed that the patents in suit relate to a graft that is deployed intraluminally and, thus, not sewn
26   into the vessel. (Mace Decl., Exs. 1, 2.)  Despite these differences, the evidence also shows that vascular grafts
     and endovascular grafts can share some common problems, such as slipping, kinking, and twisting of the grafts.
27   (*Id.*; Vikal Decl., Ex. 7 (Dilley Report).)  Therefore, regardless of whether the term vascular graft did or did not
     include endovascular grafts, Medtronic is not foreclosed from arguing that Dr. White could have derived the
28   ideas for his patents in suit directly from his consulting work related to only vascular, i.e., not endovascular,
     grafts.

1   Australia.  The first of these documents is a copy of what has been termed the "Dilley Report," which

2   is an evaluation of Medtronic's vascular graft called the "Atrium" prepared by Dr. Dilley dated June 8,

3   1989.  (Vikal Decl., Exs. 7, 8.)  The second document is a letter from Jackie Eastwood at Medtronic

4   explaining problems with Medtronic's graft.[8]  (*Id.*)

5         Medtronic argues that these documents identify five specific problems with Medtronic's

6   vascular graft.  (Medtronic Mot., p. 22.)  These problems include (1) graft cutting for fitting into

7   vessels, (2) separation of graft ring material from fabric, (3) kinking of the graft, (4)

8   extension/longitudinal movement of graft, and (5) graft handling and insertions into tissue.  (*Id.*)

9   Medtronic contends that the patents in suit "solve the very same problems that Dr. White had been

10  asked to address for Medtronic," and hence, were derived directly from his work under the Medtronic

11  Agreement.  (Medtronic Mot., p. 22.)

12              **(a)         Problems Associated With "Graft Cutting for Fitting into Vessels"**

13        The first problem relates to issues with "graft cutting for fitting into vessels."  In his report, Dr.

14  Dilley notes that while the Medtronic graft had been touted as being easier to handle than other graft

15  materials, the ease in handling "is basically obliterated when you have to cut the graft with cautery.  It

16  makes the rim of the fabric stiff and a little difficult to sew...."  (Vikal Decl., Ex. 8.)  Jackie Eastwood

17  reports that "the 'beading' [or clumping of the graft material] is a result of using the cautery at a low

18  temperature and cutting slowly."  (Vikal Decl., Ex. 9.)  Medtronic argues that two specific passages in

19  the patents in suit purportedly address this problem and is therefore evidence that Dr. White derived

20  the patents in suit directly from his work with Medtronic.

21        Dr. White argues that the first section cited by Medtronic in the '458 patent at 1:32-43 and the

22  '079 patent at 1:37-48 does not even mention problems associated with cutting grafts described

23  above, and that this language therefore fails to show a disputed issue of fact.[9]  The second passage

24  _____

25        [8]       According to Medtronic, a third document was attached to Ms. Eastwood's July 17, 1989
      letter that contained Medtronic's confidential due diligence report of the Atrium Medical Corporation.  (Vikal

26    Decl., Ex. 4.)  Medtronic makes no arguments here linking whatever information was contained in this report to
      the patents in suit, and thus is not relevant to these motions.

27
          [9]       The section referred to by Medtronic states in full that "[t]here are a number of problems

28    associated with [stents and intraluminal grafts].  These include the problem of twisting or kinking of the graft
      when it has to extend along a non-linear path, which twisting or kinking can lead to occlusion of the lumen of

1   relied upon by Medtronic states that "[w]hile the graft will normally have wires at each end of the graft

2   with their crests extending beyond the graft body, it may be necessary or desirable for a surgeon to

3   shorten a graft and this may be achieved by cutting off part of the graft body." ('458 Patent at 1:32-

4   43, 1:67-2:5; '073 Patent 1:37-48, 2:7-11.)  As with the previous section, Dr. White contends that

5   this language refers to properly measuring grafts, and not to the problem identified above that relates to

6   cutting or sewing grafts.

7       The Court agrees.  The undisputed evidence shows that endoluminal placement of the grafts

8   like the GAD-graft device does not involve cutting and sewing the graft into place.  (Mace Ex. 22

9   (Mirich et al., "Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study,"

10  *Radiology,* March 1989, p. 1036); Mace Ex. 8 (Laborde, "Intraluminal Bypass of Abdominal Aortic

11  Aneurysm: Feasibility Study," *Radiology*, 1992 ("Laborde article"); Mace Ex. 26 (Chapter 26,

12  entitled "Vascular Stents," by Drs. White and Yu in *Vascular Surgery Principles and Practice,*

13  edited by Veith, Hobson, Williams, and Wilson, 1994).)  The language above that actually does

14  mention cutting does not involve problems associated with graft cutting, or provide an improved way

15  of cutting grafts to avoid the problems identified by Dr. Dilley.  Based on the foregoing, this evidence is

16  insufficient to show that Medtronic is entitled to judgment as a matter of law that Dr. White derived the

17  patents in suit directly from evaluating this problem.  This evidence also demonstrates that Medtronic

18  does not have sufficient evidence to carry its ultimate burden of persuasion at trial.  With respect to this

19  issue, therefore, Medtronic's motion is DENIED and Dr. White's motion is GRANTED.

20          **(b)        Problems Relating to Separation of the Graft Ring From the Fabric**

21      The second problem identified with Medtronic's vascular graft relates to issues with the graft

22  ring separating from the fabric.  (Vikal Decl., Ex. 8.)  Dr. Dilley's report states that the "ring material

23  tends to separate from the fabric itself once you get the graft wet."  (*Id.*)  Medtronic argues that this

24  problem is addressed in the patents in suit where it recognizes the problem of "avoidance of

25  inadvertent separation of a supporting *stent* and the covering sleeve." ('458 Patent at 1:32-43; '073

26  Patent 1:37-48 (emphasis added).)  Dr. White contends that this evidence does not create a material

27  _____

28  the graft; lack of precise control of the expansion of the graft in the lumen; avoidance of inadvertent separation
    of a supporting stent and the covering sleeve; and maintaining the graft against longitudinal movement along
    the lumen in which it is placed."  (Mace Decl., Exs. 1, 2.)

1   issue of fact because separation of the stent from the graft is different from the separation of the ring

2   structure from the graft material.  (White's Opp., p. 9.)

3       The Court agrees with Dr. White.  The evidence demonstrates that Medtronic's vascular graft

4   has a supporting ring structure woven into the graft fabric.  (Vikal Decl., Ex. 19)  The graft fabric is

5   wrapped around a stent and, as described in the article authored by Drs. White, Yu, and May,

6   "Stented and Non-Stented Endoluminal Grafts for Aneurysmal Disease: The Australian Experience"

7   (the "Australian experience article"), secured to the vessel with "sutures or gluing."  (Mace Decl., Ex.

8   13.)  The problem identified by Dr. Dilley relates to separation of the ring structure from the graft

9   material, whereas the problem identified by the patents in suit relates to separation of the graft material

10   from the stent.  Based on the fact that the evidence shows that the problem identified in the patents in

11   suit is different from the problem identified by Dr. Dilley, Medtronic fails to show that it is entitled to

12   judgment as a matter of law that Dr. White derived the patents in suit directly from evaluating this

13   problem.  This evidence also demonstrates that Medtronic does not have sufficient evidence to carry

14   its ultimate burden of proof at trial.  With respect to this issue, therefore, Medtronic's motion is

15   DENIED and Dr. White's motion is GRANTED.

16       Also related to this issue is Medtronic's unsubstantiated contention that "[t]hrough his work

17   under the [Medtronic Agreement], Dr. White was exposed to the concept of a ring support structure."

18   (Medtronic Mot., p. 10.)  The undisputed evidence shows, however, that prior to even entering into

19   the Medtronic Agreement and while he was employed by UCLA-Harbor, Dr. White had used "grafts

20   that had a ring structure both built into the wall of the graft and around the graft."  (Mace Decl., Ex. 30

21   (White Depo. 46:5-7).)  Articles included in the record describing tests of endovascular grafts also

22   demonstrate that the concept of a ring structure, similar to both Medtronic and Dr. White's vascular

23   grafts, was not new in the field of vascular surgery when Dr. White entered into the Medtronic

24   Agreement.  For example, an article published by the American Journal of Surgery in August 1989

25   discussed tests completed by one researcher, Dr. Oz, in 1980-1982 involving "a sutureless

26   intraluminal prosthesis in the abdominal aorta" and updates his experience with "sutureless intraluminal

27   *ringed* prosthesis in the abdominal aorta and review technical considerations pertaining to insertion of

28   the graft and the construction of composite grafts..."  (Mace Decl., Ex. 31 (emphasis added).)

Likewise, the article entitled "Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study" published in *Radiology* in 1989 tests an endovascular graft using "wire bent into a six-tip zig-zag configuration..." (Mace Decl., Ex. 22.)  Medtronic's unsubstantiated claim that Dr. White derived the ring design for the patents in suit directly from his consulting work fails to demonstrate that it is entitled to judgment as a matter of law with respect to this issue.  This evidence also demonstrates that Medtronic does not have sufficient evidence to carry its ultimate burden of proof at trial.  With respect to this issue, therefore, Medtronic's motion is DENIED and Dr. White's motion is GRANTED.

>    **(c)**     **Problems Relating to Kinking and Twisting of the Graft Material, and Extension/Longitudinal movement of the Graft.**

The third and fourth problems relate to issues that arise with ensuring that the vascular graft remains in position after it is implanted.  One problem relates to "kinking of the graft." (Medtronic Mot., p. 22.)  Specifically, Dr. Dilley noted that "I think you have to put quite a bit more tension on the prosthesis than surgeons are use [sic] to doing in order to avoid redundancy and *subsequent kinking.*" (*Id.* (emphasis added).)  Dr. Anderson's report attached to Jackie Eastwood's letter suggests that the problem of kinking and twisting is caused, in part, by difficulties in suturing the graft to the vessel wall.  The fourth problem relates to "extension/longitudinal movement of the graft." (*Id.*)  Dr. Dilley reports that "the graft is extremely elastic in the longitudinal access.  This makes it quite difficult to get the length just right."

To support its contention that Dr. White derived the patents in suit directly, Medtronic points to language in the patents in suit stating recognizing the problem of "twisting or kinking of the graft when it has to extend along a non-linear path, which twisting or kinking can lead to occlusion of the lumen of the graft." ('458 Patent at 1:32-43; '073 Patent 1:37-48.)  Medtronic also argues that the fourth problem is addressed in the patents in suit where it recognizes the problem of "lack of precise control of the expansion of the graft in the lumen." ('458 Patent at 1:32-43; '073 Patent 1:37-48.)

Having reviewed the evidence submitted by both Dr. White and Medtronic, the Court finds that genuine issues of material fact exist over whether Dr. White derived directly from his work with Medtronic the ideas expressed in the patents in suit that relate to kinking, twisting, and longitudinal movement of a graft.  Unlike the previous problems identified in the Dilley Report and Ms. Eastwood's

1    letter, the problems relating to "kinking, twisting, and longitudinal movement" appear to be addressed

2    by the patents in suit, albeit in connection with endovascular grafts rather than vascular grafts.  In light

3    of various statements in the record by Dr. White that he began to develop the endovascular graft

4    design that ultimately became the patents in suit in 1989, that there is no genuine issue of material fact

5    that Dr. White did not derive, at the very least, his ideas for the patents in suit from his evaluation of

6    these problems.  (Vakil Decl., Ex. 14, ¶ 7; Vikal Decl. Ex. 1 (Dr. White's July 20, 2004 Declaration);

7    Vikal Decl., Ex. 15, p. 108 (Australian Experience article).)  Based on the foregoing, the Court

8    concludes that genuine issues of material fact exist over whether Dr. White was able to derive the

9    ideas, etc. for the patents in suit directly from the problems identified in the Dilley report and Ms.

10   Eastwood's letter relating to kinking, twisting, and longitudinal movement of the graft.

11                    **(d)        Problems Associated with Graft Handling and Insertions Into Tissue**

12                  This problem appears to be closely related to the first problem, which focused on difficulty in

13   cutting the graft and inserting or fitting it into vessels.  Medtronic argues that language in the patents in

14   suit stating that "the invention relates to a method for positioning an intraluminal graft ... comprising

15   introducing a catheter into a vein, ..." supports its claim that Dr. White derived directly the patents in

16   suit.  (Mace Decl., Ex. 2 ('073 patent 1:60-62; '458 patent 1:54-63).)  Just as with the first problem,

17   the evidence proffered by Medtronic shows that the problem of "graft handling and insertions into

18   tissue" identified in Dr. Dilley's report is associated with the cutting and suturing aspect of implantation

19   of the Medtronic vascular graft.  The endovascular graft, however, is implanted by way of catheter and

20   does not involve suturing.  As with the Court's discussion of the first problem, this evidence is

21   insufficient to show that Medtronic is entitled to judgment as a matter of law that Dr. White derived the

22   patents in suit directly from evaluating this problem in connection with his work under the Medtronic

23   Agreement.  This evidence also demonstrates that Medtronic does not have sufficient evidence to

24   carry its ultimate burden of proof at trial.  With respect to this issue, therefore, Medtronic's motion is

25   DENIED and Dr. White's motion is GRANTED.

26                  For the foregoing reasons, Dr. White's motion for partial summary judgment is GRANTED

27   with respect to problems one, two, and five discussed above.  Due to the existence of genuine issues

28   of material fact relating to problems three and four, Dr. White's motion for partial summary judgment

1  with respect to these problems is DENIED and Medtronic's motion for partial summary judgment is

2  DENIED.

3       **C.**     **The LA Biomed Agreement**

4       LA Biomed bases its ownership claims to the patents in suit on research that Dr. White

5  performed at LA Biomed's facilities in December 1992 and January 1993.  LA Biomed contends that

6  this research constituted "reduction to practice" under the LA Biomed Agreement.[10]  Dr. White

7  disputes this argument and claims that reduction to practice occurred in Australia prior to his research

8  at LA Biomed.

9            **1.**     **Reduction to Practice Defined**

10       Reduction to practice is a question of law that is based on subsidiary factual findings.

11  *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir. 1986).  To satisfy

12  its burden to show reduction to practice while Dr. White was conducting research at LA Biomed, LA

13  Biomed must demonstrate that (1) Dr. White constructed an embodiment or performed a process that

14  met all the limitations of the claimed invention, and (2) he determined that the invention would work for

15  its intended purpose.  *Cooper v. Goldfarb,* 154 F.3d 1321, 1327 (Fed. Cir. 1998) (citations

16  omitted).  "In order to corroborate a reduction to practice, it is not necessary to produce an actual

17  over-the-shoulder observer.  Rather, sufficient circumstantial evidence of an independent nature can

18  satisfy the corroboration requirement." *Id. citing Knorr v. Pearson,* 671 F.2d 1368, 1373 (CCPA

19  1982).

20       LA Biomed argues that "reduction to practice" cannot occur outside of the United States,

21  citing 35 U.S.C. § 104 (Gaede Decl., Ex. 12, Section 104 (pre-1993 amendment).)  This statutory

22  provision relates to patent interference proceedings, and specifically prohibits a patent applicant from

23  relying on activities that constitute reduction to practice outside of the United States to establish an

24  earlier invention date.  There is nothing in the LA Biomed Agreement that mentions § 104, or states

25  _____

26       [10]     It is undisputed that LA Biomed's ownership claims, if any, flow from language in the LA
Biomed Agreement stating that Dr. White is obligated to disclose and assign to LA Biomed inventions that are
either conceived or reduced to practice while using LA Biomed's facilities.  (Mace Decl., Ex. 4.)  Here, the parties

27  do not appear to dispute that Dr. White did not conceive of his idea for the patents in suit while at LA Biomed
in 1992 and 1993.  Therefore, the Court's discussion regarding LA Biomed's ownership claims focuses on

28  whether Dr. White reduced to practice the patents in suit at LA Biomed, and not when he conceived of the ideas
for the patents in suit.

that a "reduction to practice" means a reduction to practice in the United States.  None of the authority on which LA Biomed relies involves application of section 104 in a breach of contract case to limit reduction to practice to the United States, but rather involves patent interference proceedings.  Based on the foregoing, the Court interprets the term "reduction to practice" as not limited to activities in the United States.

### 2.   Genuine Issues of Material Fact Exist Over Whether Some, But Not All, of the Testing at LA Biomedical Constitutes Reduction to Practice.

LA Biomed contends that the testing performed by Dr. White at its facilities constituted reduction to practice sufficient to give rise to ownership rights in the patents in suit under the LA Biomed Agreement.  It is undisputed that these tests included (1) overlapping two GAD devices and then conducting pull-apart testing, inspection of the interior of the vessel using an endoscope, visual inspection, inspection with an intravascular ultrasound probe, calibration and measurement of the thickness of the graft materials, and effect of expansion of balloons during deployment of intraluminal grafts (collectively, the "bench top testing"); and, (2) intraluminally placing a unibody GAD-graft attachment device into six mongrel dogs.[11] (White's 1/11/05 Depo., p. 339; Gaede Decl., Ex. 10.; Dr. Yu's Depo., p. 76.)  Dr. White argues that the foregoing testing did not constitute reduction to practice because the bench top testing had been successfully tested in Australia prior to coming to LA Biomed.  Dr. White also claims that the canine testing cannot constitute reduction to practice because it did not involve overlapping GAD-graft devices, an essential claim of the patents in suit.

### (a).   Genuine Issues of Material Fact Exist Over Whether Bench Top Testing Constituted Reduction to Practice at LA Biomed.

LA Biomed bases its argument that the bench top testing constituted reduction to practice at LA Biomed on Dr. White's declaration submitted to the PTO in 2000 stating that while at LA Biomed he tested "[m]ore than twenty grafts [] and the bench tests indicated that one graft could be supported

---

[11]   While Dr. White was in the United States in December 1992 and January 1993, he also performed tests at VA-Long Beach under Dr. Gordon.  At VA-Long Beach, Dr. White performed turbulence tests to examine how much turbulence flow there was when he overlapped the grafts.  According to Dr. White, he knew the turbulence test was successful because the test had been "tested and trialed [] before" in Sydney.  (Id. at 285:21-25.)

within another."[12]  (Gaede Decl., Ex. 8, ¶ 9.)  Dr. White argues that the bench top testing involving overlapping GAD-graft devices did not constitute reduction to practice at LA Biomed because the evidence demonstrates that Dr. White performed these tests in Sydney prior to coming to the United States.  (Mace Decl., Ex. 9 (White Depo., 261:16-25; 284:3-285:9).)  Specifically, Dr. White relies on a diary entry made by Dr. Yu in Australia on July 3, 1992 that he claims reflects a reduction to practice of overlapping GAD-grafts.  (White Mot., p. 7-8; Yu Decl., Ex. C.)  This diary entry states: "[s]equential inflation of GAD+graft was done in GW and Charles Fischer's presence."  (*Id.*)  Dr. Yu states in his declaration that "[t]his diary entry confirms that a graft was inflated and then a GAD inflated inside the graft."  (Yu Decl., ¶ 5.)  At his deposition, Dr. Yu identified this entry as relating to the overlapping of two GAD-graft devices.  (Mace Decl., Ex. 11 (Yu (2005) Depo. 88:24-89:2).)

To refute Dr. White's evidence of reduction to practice in Australia, LA Biomed contends that the "GAD+graft" diary entry does not necessarily reflect a reduction to practice because Dr. White previously used the term GAD to reference a "graft attachment device" in his deposition testimony, and that the "GAD+graft" language therefore relates to "a metallic wiry structure and a graft [and] not [to] two things that White now calls GAD grafts or to the overlapping of such grafts."  (LA Biomed Opp., p. 9 (citing Mace Decl., Ex. 9 (White's 2005 Depo., 247-48, 250-52).)  The ambiguity regarding this diary entry is further demonstrated by Dr. Yu's deposition testimony in 2004 where, after reviewing the same diary entries, Dr. Yu testified that "I think I can state I don't see any specific device of a GAD graft overlapping into another GAD graft in this document."  (Mace Decl., Ex. 12 (Yu 2004 Depo., 179:19-22).)

Notwithstanding this inconsistent testimony, Dr. White argues that the Australian Experience

---

[12]    Contrary to LA Biomed's contentions, Dr. White's claim here that he reduced to practice the patents in suit in Australia prior to coming to the United States is not necessarily inconsistent with his declaration to the PTO in 2000 stating that "in December of 1992 I undertook bench testing of an endovascular graft having features disclosed in the [patent applications for the '458 and '079 patents].  This bench testing occurred at [LA Biomed].  The bench testing included placing an endovascular graft inside another graft and balloon expanding the endovascular graft therein.... More than twenty grafts were tested and the bench tests indicated that one graft could be supported within another."  As LA Biomedical points out, between 1985 and 1993, the patent interference statute required a foreign inventor to demonstrate conception and reduction to practice in the United States in order to obtain an invention date that predated the filing of his/her first patent application.  35 U.S.C. § 104 (1993).  While Dr. White's declaration relates to reduction to practice in the United States, it does not foreclose the possibility that he first reduced to practice the patents in suit in Australia prior to coming to LA Biomed.

1    article stating that "we also found that GAD-grafts could be overlapped" corroborates his argument

2    that "GAD+graft" means overlapping GAD-graft devices.  This article, which was published in 1995,

3    does not state where or when this test was conducted.  (Mace Decl., Ex. 13.)  Likewise, Dr. White's

4    reliance on the *Angiology* article is not helpful because it does not discuss overlapping GAD-graft

5    devices.  (*Id.*, Ex. 14.)  Dr. White's reliance on the testimony of Dr. James May, who worked with

6    Drs. White and Yu, also fails to eliminate the disputed issues of fact because his conclusion that GAD-

7    graft devices were overlapped and tested in Australia prior to coming to LA Biomed is based on the

8    Australian Experience and Angiology articles.  As previously stated, these articles do not resolve the

9    disputed issues of fact relating to whether Dr. White conducted tests of overlapping GAD-graft

10   devices in Australia in July 1992.[13]

11          Based on the foregoing, the Court concludes that genuine issues of material fact exist over

12   whether the bench top testing at LA Biomed constituted reduction to practice.  Dr. White and LA

13   Biomed's motions for partial summary judgment on this issue are therefore each DENIED.

14          **(b).    There are No Genuine Issues of Material Fact that the Canine Testing Did Not Constitute Reduction to Practice.**

15

16          Dr. White and LA Biomed dispute whether the canine studies conducted by Dr. White at LA

17   Biomed constituted reduction to practice.  It is undisputed that these tests involved endoluminal

18   placement of a *unibody* GAD-graft attachment device, and not overlapped grafts.  (Mace Decl., Ex. 9

19   (White 2005 Depo., pp. 329-30).)  Also undisputed by the parties is that the patents in suit all involve

20   overlapped devices.  (LA Biomed Mot., p. 2 (stating that the patents in suit "claim subject matter that

21   at a minimum, require ***overlapping*** of two intraluminal grafts") (emphasis in original); '073 Patent at

22   C. 6, 1.43; '458 Patent C.6,1.11.)

23   _____

24          [13]     To refute Dr. White's argument that "GAD+graft" means testing of overlapping GAD-grafts, LA Biomedical also argues that an earlier entry on the same day stating that  "[s]uccessful deployment of GAD in vitro" suggests that the "GAD+graft" entry "likely means that a woven Dacron graft was combined in some way with a wire structure.  But it is not clear how."  (LA Biomed Opp., p. 8-9.)  LA Biomed also argues that the absence of any language stating that the grafts were "overlapped" further supports its argument that "GAD+graft" doesn't mean overlapping GAD-grafts.  (*Id.*)  According to LA Biomed, the use of the term "sequential" does not mean that the GAD-grafts were overlapped, but rather means that Dr. Yu sequentially inflated different sized balloons.  (*Id.*)  LA Biomed's interpretation of Dr. Yu's diary entry, however, is unsupported by evidence in the record, and therefore is insufficient to refute Dr. White's claim that this entry reflected a successful test of overlapping GAD-graft devices.

1    Evidence submitted by LA Biomed fails to show that LA Biomed is entitled to judgment as a

2    matter of law that the canine testing constituted reduction to practice at LA Biomed.  LA Biomed

3    points to a statement in the *Vascular Surgery* article that "[e]ndoluminal placement of ... graft-stent

4    devices is feasible as *demonstrated in this canine model*" to support its argument that reduction to

5    practice occurred at LA Biomed.  The feasibility of endoluminal placement of a GAD-graft device,

6    however, is only one component of what the patents in suit address and does not address the feasibility

7    of overlapping these devices and delivering them intraluminally to the damaged vessel.  (*Id.*, Ex. 18

8    (*Vascular Surgery* article, p. 447) (emphasis added).)  LA Biomed's reliance on a statement made by

9    Dr. White that the canine study constituted the "ultimate flow testing" of the GAD-device does not

10   create a genuine issue of material fact here because it is undisputed that this "ultimate flow testing" was

11   not testing the patented technology.  (Mace Decl., Ex. 9 (White 2005 Depo. 339:6-8).)  If, as the

12   parties agree, the patents in suit claim subject matter that at a minimum requires the "overlapping of

13   two intraluminal grafts," or in other words, overlapping GAD-graft devices, the first prong of the

14   reduction to practice test necessarily requires testing of an overlapped GAD-graft device.  Elsewhere

15   in its motion, LA Biomed highlights the necessity of testing overlapped GAD devices to show

16   reduction to practice, and it may not take an inconsistent position with respect to the canine testing

17   simply because it supports their argument.

18       Based on the foregoing, the evidence shows that LA Biomed fails to satisfy its burden on this

19   issue.  This evidence also demonstrates that LA Biomed does not have sufficient evidence to show that

20   the canine testing constituted reduction to practice.  LA Biomed's motion for summary judgment on

21   this issue is therefore DENIED and Dr. White's motion for summary judgment on this issue is

22   GRANTED.

23   **IV.    DR. WHITE'S MOTION TO STRIKE MEDTRONIC'S AMENDED COMPLAINT**

24

25       Currently pending before the Court is the motion of Dr. White to strike Medtronic's Amended

26   Complaint filed on January 10, 2005.  This motion is scheduled to be heard on Friday, May 20, 2005

27   at 9:00 a.m.  Having reviewed Dr. White's motion and the Amended Complaint, it is HEREBY

28   ORDERED that Dr. White's motion to strike Medtronic's Amended Complaint is DENIED and the

     hearing scheduled for Friday, May 20, 2005 is VACATED.   Federal Rule of Civil Procedure 15(a)

1    permits a party to amend its pleading once as a matter of right at any time before a responsive pleading

2    is served.  Once a responsive pleading has been served, however, amendment requires written

3    consent of the adverse party or leave of the court.  In accordance with the Rule 15(a)'s liberal

4    pleading standard, leave of the court "shall be freely given when justice so requires."  Fed. R. Civ. P.

5    15(a).

6         Here, Medtronic clearly and inexplicably violated the plain language of Rule 15 by filing an

7    amended complaint without leave of court and over strenuous objection by Dr. White.  When asked to

8    explain its blatant violation of Rule 15, Medtronic was unable to provide any satisfactory response.

9    Had Medtronic complied with Rule 15(a) by filing a properly noticed motion to amend, it is likely that

10   under the liberal pleading standards and Ninth Circuit authority, that the motion would have been

11   granted.  Medtronic did not elect this path, and as a result, Dr. White was forced to file a motion to

12   strike the amended complaint.

13        In the interest of preserving judicial resources, and in light of Rule 15's liberal pleading

14   standards, the Court will permit Medtronic to file its amended complaint.  Dr. White is HEREBY

15   ORDERED to file an amended answer by **Friday, May 6, 2005**.  As a sanction for violating Rule 15,

16   however, Medtronic is FURTHER ORDERED to pay Dr. White's attorneys' fees and costs incurred

17   in filing his motion to strike.  Dr. White shall submit a declaration attaching billing records supporting its

18   claim for attorneys' fees and costs incurred in connection with his motion to strike by no later than

19   **Friday, April 29, 2005.**  The Court will issue an order regarding the attorneys' fees after it has had an

20   opportunity to review the declaration.

21   **V.   CONCLUSION**

22        Based on the foregoing reasons, Dr. White's motion for partial summary judgment is

23   GRANTED IN PART and DENIED IN PART.  The motions for partial summary judgment filed by

24   Medtronic and LA Biomed are each DENIED.  Genuine issues of material fact exist as to the

25   following issues:

26        (1)    Whether Dr. White was able to derive directly the ideas, etc. that formed the basis for

27            the patents in suit from the two following problems identified in the Dilley Report and

28            by Ms. Eastwood: (a) problems associated with kinking of the graft, and (b) problems

18

1        with extension/longitudinal movement of the graft;

2        (2)        Whether the bench top testing involving overlapping GAD-graft devices constitutes

3              reduction to practice at LA Biomed.

4        Because neither party moved for partial summary judgment relating to Dr. White's affirmative

5    defenses to each of Medtronic's and LA Biomed's claims, Dr. White's affirmative defenses as they

6    relate to ownership of the patents in suit will also be tried on the merits.  To avoid any confusion, the

7    issues presented at trial will continue to be narrowed to ownership of the patents in suit.  The partes

8    are HEREBY ORDERED to appear for a case management conference on Friday, May 13, 2005 at

9    1:30 p.m. to set pretrial and trial dates.

10        **IT IS SO ORDERED.**

11    Dated: April 21, 2005                          /s/ Jeffrey S. White
                                           JEFFREY S. WHITE
12                                      UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28